UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIK HUNG LE,<br><div align="right">Petitioner,</div><br><br>v.<br><br>M.E. SPEARMAN, Warden,<br><div align="right">Respondent.</div> | Case No.:  16-cv-02302-WQH (RNB)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to the Honorable William Q. Hayes, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d) of the United States District Court for the Southern District of California.

## PROCEEDINGS

On September 9, 2016, Petitioner Erik Hung Le ("Petitioner" or "Le"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

§ 2254. (ECF No. 1 ("Pet.").)[1] Petitioner challenges his convictions in San Diego Superior Court, Case No. SCD212126, for attempted willful, deliberate, and premeditated murder, discharging a firearm from a motor vehicle, and assault with a semi-automatic firearm. (*Id.*) Petitioner raises four grounds for relief in the Petition he has filed in this Court.

On February 7, 2017, Respondent M.E. Spearman, Warden ("Respondent"), filed an Answer and Notice of Lodgment. (ECF Nos. 8, 9.) Petitioner did not file a Traverse.

After a thorough review of the pleadings and all supporting documents, the Court **RECOMMENDS** that the Petition be **DENIED**.

## BACKGROUND

On March 27, 2009, the San Diego County District Attorney filed an information charging Petitioner and co-defendant Down George Yang ("Yang")[2] with murder (count 1, Penal Code[3] § 187(a)); attempted willful, deliberate and premeditated murder (count 2, Penal Code §§ 664, 187(a)); discharging a firearm from a motor vehicle (count 3, Penal Code § 12034(d)); and assault with a semi-automatic firearm (counts 4 & 5, Penal Code § 245(b)) in Superior Court of California, County of San Diego, Central Division, Case No. SCD212126. (ECF No. 9-37 at 24-28.) As to all counts, it was alleged that Petitioner and Yang committed the crime for the benefit of a criminal street gang (Penal Code § 186.22(b)). (*Id.*) As to counts 1, 2, and 3, it was alleged that Petitioner and Yang were principals in the offense and that during its commission, at least one principal used a firearm (Penal Code § 12022.53(d), (e)). (*Id.*) Finally, as to counts 4 and 5, it was alleged

---

[1]    Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing ("ECF") system.

[2]    Kane Bo Pathammavong was also a named co-defendant. However, he reached a plea agreement before trial.

[3]    All references herein to the Penal Code refer to the California Penal Code.

that Yang personally used a firearm (Penal Code § 12022.5(a)(1)).  (*Id.*)

A trial by jury was held beginning on or about January 19, 2010.  (*See* ECF No. 9-43 at 41-42.)  On February 19, 2010, the jury found Petitioner and Yang guilty of all charged counts and found that all alleged enhancements were true.  (*See* ECF No. 9-1 at 2; ECF No. 9-45 at 16-27.)  On May 7, 2010, the trial court sentenced Petitioner to an indeterminate term of 96 years to life.  (*See* ECF No. 9-1 at 2; ECF No. 9-41 at 199-02; ECF No. 9-36 at 1-46.)  That same day, the court sentenced Yang to an indeterminate term of 101 years to life.  (*See* ECF No. 9-1 at 2; ECF No. 9-41 at 195-98; ECF No. 9-36 at 47-78.)

On direct appeal, Petitioner raised several grounds for relief, including the four claims being raised by him herein.  (*See* ECF No. 9-3 at 39 to ECF No. 9-4 at 22.)

On April 27, 2012, the Court of Appeal affirmed the judgment of the Superior Court in a partially published opinion.  (ECF No. 9-1; *see also* ECF No. 9-12 at 23-25.) Petitioner, Yang, and the People petitioned for review.  (ECF No. 9-4 at 31 to ECF No. 9-12 at 26.)  Petitioner raised, *inter alia*, the same claims he is raising herein.  (ECF No. 9-7 at 3-81.)  On July 25, 2012, the California Supreme Court denied the petitions filed by Petitioner and Yang without citation or comment.  *See People v. Le*, 282 P.3d 173 (2012). On June 15, 2015, the California Supreme Court affirmed the judgment.  *See People v. Le*, 61 Cal. 4th 416 (2015).  Petitioner did not file any collateral challenges in state court.  (*See* Pet. at 3.)

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

The Court has independently reviewed the state court record.  *See Nasby v. McDaniel*, 853 F.3d 1049, 1052-54 (9th Cir. 2017) (citing *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997)) (finding that "meaningful collateral review of the state court's adjudication of petitioner's claims requires an 'independent' assessment of the basis for the state court's decision.").  Based on its independent review of the record, the Court adopts the following factual summary from the "Factual Background" section of the

partially published California Court of Appeal[4] opinion in *People v. Le*, *et al.*, Case No. D057392 (Cal. Ct. App. April 27, 2012) as a fair and accurate summary of the evidence presented at trial:

> In 2002 Le and [Down George Yang (Yang)] were members of the Tiny Oriental Crips (TOC), a criminal street gang that claimed as its territory Linda Vista and parts of Mira Mesa, communities within the City of San Diego. TOC territory included the Han Kuk Pool Hall (pool hall) located on Convoy Street then owned by Don Su (Don) and his wife Kyung Su (Kyung) (together, the Sus). The Sus had owned the pool hall for about three months at the time of shooting. Rivals of TOC included Asian Crips (AC) and the Tiny Rascal Gang (TRG). The pool hall was managed by the Sus' nephew, Min Su (Min).

> On the night of June 14, 2002, TOC member Kane Bo Pathammavong and his friends Gerry Ian Sulit, Phouthasanoe Volvo Syrattanakoun, Sherri Pak and Rei Morikawa were drinking in a grassy area near the pool hall. During the evening, Le joined the group. At some later point, Le spotted AC members near the pool hall and yelled out a gang challenge.

> Le left to make a phone call to Yang. When Le returned, he told Pathammavong and Syrattanakoun to leave with their friends. Pathammavong and his group left and went to a tea house located in the same shopping center as the pool hall.

> Octavius Soulivong (Octavius) was at the house of his twin brother Orlando, along with Yang and several other TOC members. Around midnight, Orlando received a telephone call. Orlando claimed the caller was Le. After talking to Le, Orlando handed the phone to Yang, who walked outside to talk. When Yang returned, he told the group that he and Le were going to the pool hall. About 15 minutes later, Le arrived at the house. Le told the group there were some AC members at the pool hall and asked whether anyone had a "strap" (e.g., slang for gun). Le left the house shortly thereafter with Yang and John Vue.

> Pathammavong and his friends were at the tea house when Le returned. Le said he needed to take care of something and told Pathammavong and his group to stay put. Another car pulled up and parked next to Le's car. Le

---

[4]    All references herein to the Court of Appeal refer to the California Court of Appeal.

16-cv-02302-WQH (RNB)

spoke to a passenger in that car, returned to Pathammavong and his group and told them not to follow. Both cars then left the parking lot.

Pathammavong did not take Le's advice. Thinking there might be a fight or shooting because of the "tension," Pathammavong and Sulit began driving to the pool hall in Pathammavong's car. On the way they heard gunshots and decided to return to the tea house.

At the time of the shooting, Don and his friend Jinwon Lee were outside the pool hall. TRG members Michael Lieng and Nikhom Somsamout arrived in the parking lot near the pool hall. A car with two people inside pulled into the alley near the pool hall. Shots were fired from the car and then the car sped away. One of the bullets struck Don in the neck area. Another struck Lieng in the right elbow and a third bullet struck Somsamout in the right foot. Don died three days later from the gunshot wound.

After the shooting, Le and Yang returned to Orlando's house where, according to Octavius, they spoke about the shooting. Le claimed he was the driver and Yang the shooter. Le also claimed Yang "shot the whole clip" from the rear left seat of the car driven by Le; Yang shot at people in front of the pool hall and kept shooting without aiming. Le referred to AC members as "ass crack," and bragged that he and Yang shot at them. During Le's recounting of the shooting, Yang interjected and corrected some of Le's statements about the shooting.

TOC members subsequently learned that the shots fired on the night of June 14 had struck and killed Don and not AC members. TOC members, including Yang, agreed not to discuss the shooting any more.

Police investigators recovered a beer bottle in the alley on the south side of the pool hall; a fingerprint matched to Le was found on the neck of the bottle. Police also found several cartridge casings consistent with a 9 millimeter Luger semi-automatic. Because police did not have a murder weapon, a casing was placed into a computer database matching bullets to weapons.

During a search warrant executed at Yang's home, police found under a bed an empty box of 9 millimeter casings along with a gun-cleaning kit. Yang's fingerprints were on the gun box and an instruction manual for the gun.

In early 2005, Deputy Richard Sanchez of the San Diego County Sheriff's Department stopped a car for speeding. The driver was Daniel

Manalo, a member of the "B–Down" criminal street gang.  During a search of the vehicle, Deputy Sanchez found a 9 millimeter Jennings Bryco semi-automatic handgun with an illegible serial number.  Manalo claimed he bought the gun a short time earlier from an individual in Del Mar.

Criminalist Mary Jane Flowers of the San Diego Police Department found the gun had a serial number "1452_66" with the "_" being either a 3 or a 5. Flowers test-fired the gun and placed the results in the computer database. A match came back to the pool hall shooting and four other shootings.

Investigators traced the gun to Yang's older brother, Meng.  Meng told police he purchased the gun for Yang from a federally-licensed firearms dealer at a gun show in October 2001.  Although Meng filled out the paperwork to acquire the gun, Yang paid for the weapon and accompanied Meng to pick up the gun after the waiting period.  Meng told police he gave Yang the gun that day and never saw it again.

Meng identified the box of ammunition recovered during the search warrant as the box that came with the gun.  When a detective asked Meng about the gun, Meng said he bought it for Yang and did not know its whereabouts.  Meng then blurted out, "Was it used in a murder or something?"

In August 2007 police obtained authorization to wiretap Yang's phone. The record includes myriad incriminating statements involving Yang and the shooting[.][5]

(ECF No. 9-10 at 10-14.)


## PETITIONER'S CLAIMS HEREIN

1.    The prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963) by suppressing an e-mail that a defense witness, Tina Ngyuen, sent to the prosecutor's investigator.  (Pet. at 6.)

2.    The prosecutor committed misconduct by misadvising the trial court that defense counsel elicited testimony that the prosecutor actually had elicited, and by procuring a curative instruction based on the misrepresentation.  (Pet. at 7.)

---

[5]    The Court of Appeal's Factual Background includes transcripts of some of the wiretapped calls, dated August 14-16, 2007, which the Court omits herein.

3. The trial court violated Petitioner's right to due process by giving the requested curative instruction. (Pet. at 8.)

4. Trial defense counsel provided ineffective assistance by failing to request a jury instruction on third-party culpability. (Pet. at 9.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams*, 529 U.S. at 391, 404-05, 413. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *See Williams*, 529 U.S. at 406. However,

7

the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *See Early*, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.'" *See Early*, 537 U.S. at 11 (citing 28 U.S.C. § 2254(d)) (emphasis added). A state-court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams*, 529 U.S. at 406-10, 413 (*e.g.,* the rejected decision may state the *Strickland* standard correctly but apply it unreasonably); *Woodford v. Visciotti*, 537 U.S. 19, 24-27 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti*, 537 U.S. at 24-27; *Williams*, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams*, 529 U.S. at 409-10; *Visciotti*, 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 699 (2002). Moreover, review of state court decisions under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *See Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).

As the Supreme Court explained in *Harrington v. Richter*, 562 U.S. 86 (2011):

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [*i.e.*, where there was no reasoned state-court decision], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Id*. at 102.

Furthermore, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *See id.* at 103.

Here, claims encompassing Grounds 1-4 of the Petition were raised by Petitioner on direct appeal and denied by the Court of Appeal in a reasoned decision. Those same claims encompassing Grounds 1-4 were then presented in Petitioner's Petition for Review, which the California Supreme Court denied. Accordingly, for purposes of applying the AEDPA standard of review to Grounds 1-4 herein, the Court of Appeal decision on direct appeal constitutes the relevant state court adjudication on the merits. *See Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (where state supreme court denied discretionary review of decision on direct appeal, the decision on direct appeal is the relevant state-court decision for purposes of the AEDPA standard of review).

## DISCUSSION

### A.  Habeas relief is not warranted with respect to Ground 1 of the Petition.

In Ground 1 of the Petition, Petitioner claims the prosecutor violated *Brady* by failing to disclose an August 6, 2008 email sent by Tina Nguyen to District Attorney Investigator ("D.A.I.") Daio Soliven, which summarized her knowledge of Octavius Soulivong's[6] credibility during the previous ten years, and explained that Soulivong is "a habitual liar and that he lies to get himself out of trouble." (Pet. at 6.)


#### 1.  Background

During trial, Yang's counsel informed the court on February 4, 2010 that his investigator had contacted Tina Nguyen, an ex-girlfriend of Soulivong, the day before, and that she indicated she had corresponded with D.A.I. Soliven in 2008. (*See* ECF No. 9-30 at 7-8.) The correspondence related to a search warrant executed at her home that was

---

[6]  Soulivong is also known as "Kiet," which is how he is referred to in the Petition. (*See* Pet. at 6.)

based on information the District Attorney's Office received from Soulivong. (*See id*.) Yang's counsel noted that defense counsel did not yet have a copy of that correspondence, but that he was concerned the District Attorney's Office had not turned the correspondence over. (*See id*. at 8-9.) Defense counsel further indicated that he intended to ask Soulivong, who was on the stand at the time, about the lead he gave the District Attorney's Office, which turned out to be false. (*See id*. at 9.) The trial judge ultimately ruled that testimony about the search warrant was inadmissible. (*See id*. at 17-19.)

On February 8, 2010, Yang's counsel represented to the court that he had received from Ms. Nguyen a copy of an August 6, 2008 e-mail, which she had sent to D.A.I. Soliven. (*See* ECF No. 9-31 at 8-9.) The e-mail, in essence, was a summary of her ten-year duration of knowledge regarding Soulivong. (*See id*. at 9.) In the e-mail, Ms. Nguyen stated that she knew Soulivong to be "a habitual liar, [who] lies to get himself out of trouble and also for no other reason." (*See id*.) The e-mail also included specific examples of Soulivong's lies. (*See id*.)

Yang's counsel represented to the court that D.A.I. Soliven indicated to him that he showed the e-mail to the prosecutor at some point in time, the prosecutor looked at the e-mail, read it over, and said: "Hold on to it. I don't want it." (*See id*. at 9-10.) Then Mr. Soliven put the letter in a box, and it was not turned over to the defense as *Brady* material. (*See id*. at 10.)

Defense counsel argued before the trial judge that the prosecutor should have turned the e-mail over to the defense and that the failure to do so was a violation of *Brady*. (*See id*. at 12-16.) After a hearing on February 9, 2010, outside the presence of the jury, the trial court concluded there was no *Brady* violation. (*See* ECF No. 9-32 at 150-62.) The trial court took into consideration "the other evidence that exists about [Soulivong's] credibility," noting that it was not the "sole piece of impeaching evidence as to [Soulivong] or even, frankly, a significant one." (*See id*. at 161.)

The People rested their case-in-chief on February 10, 2010. (*See* ECF No. 9-33 at 75.) Later that day, defendants called Ms. Nguyen as their first witness. (*See id*. at 93.)

Defense counsel did not question Ms. Nguyen about the search warrant or the e-mail. (*See id.* at 93-99.) However, Ms. Nguyen testified that Soulivong was a liar who would "lie about what he ate for breakfast, what he did for the day," and "l[ie] for no reason" at all. (*See id.* at 97.)

## 2. Applicable Federal Law

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The obligation extends to favorable evidence regardless of whether it was requested by the defense. *See Kyles v. Whitley*, 514 U.S. 419, 432-34 (1995); *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998). The Supreme Court has identified three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also United States v. Stinson*, 647 F.3d 1196, 1208 (9th Cir. 2011) (citation omitted). *Brady* applies not only to information known to the prosecutor, but also to "evidence known only to police investigators and not to the prosecutor." *See Strickler*, 527 U.S. at 280-81 (citation & quotation marks omitted).

As to the third *Brady* criterion, "[t]o determine whether prejudice exists, we look to the materiality of the suppressed evidence." *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008); *see also Strickler*, 527 U.S. at 282. "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *see also United States v. Jernigan*, 492 F.3d 1050, 1053-54 (9th Cir. 2007) (en banc). For this purpose, "reasonable probability" is a lower threshold than a finding that the outcome "would more likely than not" have been different. *See Kyles*, 514 U.S. at 434.

11

Rather, "favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  *See Cone*, 556 U.S. at 470 (quoting *Kyles*, 514 U.S. at 435); *see also Banks v. Dretke*, 540 U.S. 668, 698-99 (2004); *Strickler*, 527 U.S. at 290.

3.   Analysis

In rejecting this claim when Petitioner raised it on direct appeal, the Court of Appeal reasoned that even if the e-mail qualified as *Brady* material, Petitioner had failed to make the requisite showing of suppression or prejudice, stating as follows:

> Assuming the e-mail was exculpatory, there is no evidence the prosecution suppressed this information as the defense obtained it from another source and merely confirmed the prosecutor had received it at some point during the investigation. "Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him [or her]. [Citation.]  If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence. [Citations.]  Accordingly, evidence is not suppressed unless the defendant was actually unaware of it and could not have discovered it '"by the exercise of reasonable diligence."' [Citations.]" (*People v. Salazar*, supra, 35 Cal.4th at pp. 1048-1049.)

> There also is no evidence Le was prejudiced by the prosecutor's failure to produce the e-mailed letter to the defense.  "Prejudice, in this context, focuses on the 'materiality of the evidence to the issue of guilt and innocence.' [Citations.]   Materiality, in sum, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation].  A defendant instead 'must show a "reasonable probability of a different result."' [Citation.]" (*People v. Salazar*, supra, 35 Cal.4th at p. 1043.)

> The trial court in the instant case correctly noted the e-mail did not provide any new information regarding Octavius and/or his credibility (or lack thereof).  For this separate and independent reason, even if the e-mail was

12

> exculpatory and even if the People suppressed it, we conclude the trial court properly found there was no *Brady* violation because Le cannot establish he was prejudiced by its suppression.

(ECF No. 9-11 at 20-21.)  This Court concurs with the Court of Appeal's reasoning and conclusions.

First, Petitioner's counsel learned of the e-mail during trial in sufficient time to obtain it from Ms. Nguyen and to utilize it in his examination of her, if he had chosen to do so.  Thus, there was no suppression of the e-mail by the prosecutor.[7]  *See United States v. Bond*, 552 F.3d 1092, 1095 (9th Cir. 2009) (where a "defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression"); *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) (where defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government); *United States v. Dupuy*, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985) ("Since suppression by the Government is a necessary element of a *Brady* claim, . . . if the means of obtaining the exculpatory evidence has been provided to the defense, the *Brady* claim fails.") (citing *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972)).

Second, the Court of Appeal reasonably applied clearly established Supreme Court law in finding there was no prejudice.  During trial, both the prosecution and defense counsel elicited testimony regarding Soulivong's propensity for lying, and his history of lying to law enforcement.  (*See*, *e.g*., ECF No. 9-28 at 281; ECF No. 9-29 at 120, 159; ECF No. 9-33 at 97-99, 106-09.)  Soulivong also admitted on the stand that he initially lied to law enforcement about who was involved in the shooting of Mr. Su, first pointing the finger at Pathammavong and Sulit, before changing his story to say that the defendants committed the shooting.  (*See* ECF No. 9-28 at 281; ECF No. 9-29 at 159.)

---

[7]     Petitioner contends that the alleged suppression was not inadvertent.  (*See* Pet. at 6.)  However, for purposes of *Brady*, it does not matter whether the suppression of the evidence was willful or inadvertent.  *See United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013).

Moreover, as noted above, Petitioner's counsel had possession of the e-mail when he called Ms. Nguyen to testify and had an opportunity to utilize it in his examination of her, but chose not to do so. (*See* ECF No. 9-33 at 93-99.) "When a defendant has the opportunity to present impeaching evidence to the jury, . . . there is no prejudice in the preparation of his defense." *Aichele*, 941 F.2d at 764 (citing *United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978)); *see also United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (substantial opportunity to use information at trial cures any prejudice caused by delayed disclosure).

The Court therefore finds that the Court of Appeal's rejection of this claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

**B.     Habeas relief is not warranted with respect to Grounds 2 and 3 of the Petition.**

In Ground 2 of the Petition, Petitioner claims that his conviction was the result of prosecutorial misconduct. (Pet. at 7.) Petitioner contends the prosecutor engaged in misconduct by (a) misrepresenting to the trial judge that defense counsel had elicited certain details from Pathammavong regarding a 2003 shooting, when in fact it was the prosecutor who had elicited the information from this witness, and (b) procuring a curative instruction based on this misrepresentation. (*Id.*) In Ground 3 of the Petition, Petitioner makes the related claim that the trial court erred in giving the curative instruction requested by the prosecution. (*Id.* at 8.)

**1.     Applicable Federal Law**

**a.     *Prosecutorial Misconduct***

Prosecutorial misconduct is cognizable in federal habeas corpus. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[T]he appropriate standard of review for such a claim . . . is the narrow one of due process, and not the broad exercise of supervisory

power." *Id.* (internal quotation marks omitted). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (noting "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct "infected the trial with unfairness." *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Parker v. Matthews*, 567 U.S. 37, 45 (2012) (recognizing *Darden* as "clearly established Federal law" regarding prosecutorial misconduct). A prosecutorial misconduct claim is decided by "examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted).

### b.   *Erroneous Jury Instruction*

On federal habeas review of instructional error by a state court, federal courts are bound by a state court's interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (the fact that a jury instruction "was allegedly incorrect under state law is not a basis for habeas relief"). Federal habeas relief based on instructional error is warranted only if the petitioner shows "both that the instruction was ambiguous and that there was '"a reasonable likelihood"'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (citing *Estelle*, 502 U.S. at 73, n.4 (quoting *Boyde v. California*, 494 U.S. 370, 379-80 (1990))).

In making this determination, the jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

"[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). "Because it is not enough that there is some 'slight *possibility*' that the jury misapplied the instruction, *Weeks v. Angelone*, 528 U.S. 225, 236 (2000), the pertinent question 'is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,"' *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147)." *Waddington*, 555 U.S. at 191.

### 2.  Background

In its Opinion, the Court of Appeal provided the following background:

> During cross-examination, defense counsel asked Pathammavong about a shooting in 2003 that took place on Comstock Street (e.g., the Comstock shooting). Specifically, Yang's counsel asked Pathammavong whether gangs retaliate against other gang members for cooperating with authorities. After Pathammavong responded, "Yes," counsel then asked, "And isn't that—your experience is really based on the fact that you yourself were involved in a shooting on Comstock Street in 2003 for the same reason, correct?" The trial court sustained the prosecution's objection on the grounds the question was improper impeachment.

> Outside the presence of the jury, the prosecutor expressed some concern about the questioning of Pathammavong by Yang's counsel that made it appear that Pathammavong had been *convicted* of another shooting, which was not true. The prosecutor reminded the court that in a motion in limine he had asked that Pathammavong's prior conviction be referred to as "assault with a firearm, and attendant gang allegations."

> Counsel for Yang argued that the jury should hear that Pathammavong admitted as part of his plea to being in the car in the Comstock shooting, when two young girls were wounded. The trial court disagreed, finding this argument "border[ed] on specious" because counsel was impermissibly trying to show that if Pathammavong was involved in a previous drive-by shooting, he also may have committed the pool hall shooting.

> The next day, the prosecutor asked for a curative instruction based on the fact that, as he remembered it, Pathammavong had been asked by defense

counsel whether he shot two little girls in the Comstock shooting and that such questioning was beyond the court's in limine rulings. After a recess, Yang's counsel informed the court that he had reviewed the court reporter's "rough notes" and determined that defense counsel had not asked Pathammavong about shooting two girls, as represented by the prosecutor.

The trial court accepted defense counsel's representation, but recalled the issue of the shooting of the two girls on Comstock Street had come up on a few occasions. The trial court therefore ruled to give the proposed curative instruction proffered by the prosecutor, which provided in part:

"A witness's criminal history—this goes for all witnesses—is relevant for you as jurors in assessing the credibility of the testimony of a witness. As I will more fully instruct you at the conclusion of the trial, you may give a witness's criminal history whatever weight you believe it deserves in assessing the credibility.

"There will be an instruction that talks about prior convictions and how that is something that you can consider in determining the believability of a witness, and you decide how much weight you want to give it based on all of the circumstances, including the conviction.

"You are instructed that, by stipulation, the parties have agreed that Mr. Pathammavong was, in fact, convicted in 2004. He was convicted of conspiracy to commit an assault with a firearm, and there was an attendant gang allegation attached to this charge. This charge of which he was convicted in 2004 is a felony.

"Also, of course, he was convicted in 2009 of being an accessory after the fact of murder, along with a gang allegation, and that, as you heard, arose from his participation in the events about which you are hearing testimony in this trial.

"Please, ladies and gentlemen, you are instructed to disregard any other assertions or suggestions that may have been made or arisen yesterday with regard to Mr. Pathammavong's alleged role in the 2004 crime, the crime for which he was convicted in 2004. And you are likewise instructed to disregard any suggestion as to the details of that crime.

"You are, however, of course, entitled to consider the facts that he was convicted of that conspiracy to commit an assault with a firearm, along with a gang allegation.

"Counsel will be allowed to and entitled to comment on this instruction and that conviction to the extent they see fit in their closing arguments.

"If this seems to be coming to you in a vacuum, just make a note of it and give it the weight to which you believe it's entitled during your deliberations after hearing the arguments of counsel and the instructions of the court."

It is this instruction that Le contends violated his due process rights to a fair trial.

(ECF No. 9-11 at 22-25.)

### 3. <u>Analysis</u>

In rejecting Petitioner's claims corresponding to Grounds 2 and 3, the Court of Appeal did not address the question of whether the prosecutor's original misstatement rose to the level of prosecutorial misconduct, or whether the trial court had erred in giving the curative instruction. Instead, the Court of Appeal went directly to the question of whether the prosecutor's conduct and the curative instruction constituted harmless error. Specifically, the Court of Appeal concluded that it "need not determine whether the prosecution engaged in any misconduct or whether the trial court erred in giving the curative instruction because even if [it] assume[d] the record supported such conclusions, [it] nonetheless would conclude any conceivable error, misconduct or deficiency was harmless by any standard." (ECF No. 9-11 at 25 (citing *People v. Sandoval*, 4 Cal. 4th 155, 193-94 (1992) (alleged prosecutorial misconduct harmless where there was no reasonably possibility the jury would have reached a more favorable verdict had the misconduct not occurred)).)

Under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (citing *Brecht*, 507 U.S. at 637) (internal citations and quotation marks omitted). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had

substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 2197-98 (citing *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). There must be more than a "reasonable possibility" that the error was harmful. *Id*. at 2198 (citing *Brecht*, 507 U.S. at 637).

The *Brecht* test does not abrogate, however, the requirements of § 2254. *Davis*, 135 S. Ct. at 2198. Because the "highly deferential AEDPA standard" applies, a federal court may not overturn a state court's decision unless it applied its harmless error standard in an "objectively unreasonable" manner. *Davis*, 135 S. Ct. at 2198-99 (citing *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003)); *see also Fry v. Pliler*, 551 U.S. 112, 119 (2007) (a "federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable"). A state court decision is not unreasonable if fairminded jurists could disagree on its correctness. *Id*. at 2199 (internal quotations omitted) (citing *Richter*, 562 U.S. at 101). Petitioner must therefore show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. (citing *Richter*, 562 U.S. at 103).

The Court finds that Petitioner has not met this burden. The Court of Appeal reasonably determined that "any conceivable error, misconduct or deficiency was harmless by any standard." (*See* ECF No. 9-11 at 25.) First, the alleged prosecutorial misstatement was made to the trial judge outside the presence of the jury. (*See* ECF No. 9-26 at 237-40; ECF No. 9-27 at 11-15, 24-28.) Second, the alleged misstatement, *i.e.*, the misattribution of information elicited by the prosecutor to defense counsel, was corrected by defense counsel and the trial court accepted defense counsel's correction, but decided to give the curative instruction anyway. (*See* ECF No. 9-27 at 25-26.) Thus, it is inconceivable that the alleged misstatement had a substantial and injurious effect or influence in determining the jury's verdict. Moreover, as also noted by the Court of Appeal, defense counsel had an opportunity to modify the proposed jury instruction to make it more passive before it was given. (*See id*. at 25-28.)

In addition, the Court concurs with the Court of Appeal that the curative instruction, which was generally covered by the final jury instructions, did not cast the defense in a negative light.  (*See* ECF No. 9-11 at 25.)  Rather, the instruction, which "merely cautioned the jurors that the facts underlying Pathammavong's conviction in 2004 were not to be considered," was content neutral.  (*See id.*)  When the trial judge stated, "you may have heard some inaccurate information regarding [Pathammavong's] criminal history," he did not attribute the elicitation of the inaccurate information to any particular party.  (*See* ECF No. 9-27 at 28.)

The Court therefore finds that the Court of Appeal did not apply its harmless error standard in an objectively unreasonable manner.  Nor, for the same reasons, does the Court find that either the prosecutor's alleged misstatement or the trial court's curative instruction so infected the trial with unfairness as to make the resulting conviction a denial of due process.

Accordingly, Petitioner is not entitled to habeas relief on Grounds 2 and 3.

### C.    Habeas relief is not warranted with respect to Ground 4 of the Petition.

In Ground 4 of the Petition, Petitioner claims that trial counsel's failure to request a third-party culpability instruction constituted ineffective assistance of counsel and deprived him of his right to due process and a fair trial.  (Pet. at 9.)

On direct appeal, one of the claims Petitioner raised was that the trial court had erred in failing to *sua sponte* instruct the jury on a third-party culpability defense.  (*See* ECF No. 11 at 26.)  In the alternative, Petitioner claimed that his trial counsel rendered ineffective assistance in failing to request a third-party culpability defense.  (*See id.*)

The Court of Appeal rejected Petitioner's instructional error claim, citing a California Supreme Court case[8] that was on point and dispositive.  (*See id.* at 26-27.)  There, the California Supreme Court held that a trial court does not have a duty to instruct

---

[8]    *See People v. Abilez*, 41 Cal. 4th 472, 517-18 (2007).

on third-party culpability *sua sponte* where the jury was properly instructed on the defendant's presumed innocence and the requirement that the jury find him guilty beyond a reasonable doubt. (*See id.*)

The Court of Appeal also rejected Petitioner's related ineffective assistance of counsel claim. (*See* ECF No. 12 at 3-4.) It reasoned that Petitioner was not prejudiced by counsel's failure to request the instruction because the jury was properly instructed on the presumption of innocence, the People's burden of proof, and the concept of reasonable doubt. (*See id.* at 4.) In addition, the Court of Appeal found that the record clearly showed that the jury knew the defense believed individuals other than the defendants (*e.g.*, Pathammavong) committed the drive-by shooting, and if the jury believed a third-party and not the defendants committed the crime, presumably it would have acquitted one or both of the defendants of the crime. (*See id.*)

In his federal habeas petition, Petitioner has not raised the instructional error claim that he raised on direct appeal. But he has raised his ineffective assistance of counsel claim based on trial counsel's failure to request a third-party culpability instruction. (*See* Pet. at 9.)

### 1. Applicable Federal Law

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that there are two components to an ineffective assistance of counsel claim: "deficient performance" and "prejudice." *Id.* at 694. "Deficient performance" in this context means unreasonable representation falling below professional norms prevailing at the time of trial. *See id.* at 688-89. To show "deficient performance," petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Further, petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* The Court must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the

range of professionally competent assistance." *Id*. The Supreme Court in *Strickland* recognized that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id*. at 689. Accordingly, to overturn the strong presumption of adequate assistance, petitioner must demonstrate that "the challenged action cannot reasonably be considered sound trial strategy under the circumstances of the case." *See Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999), *cert. denied*, 528 U.S. 1198 (2000).[9]

To meet his burden of showing the distinctive kind of "prejudice" required by *Strickland*, petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See Strickland*, 466 U.S. at 694; *see also Richter*, 562 U.S. at 111 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (noting that the "prejudice" component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair").

Moreover, it is unnecessary to address both *Strickland* requirements if petitioner makes an insufficient showing on one. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.");

---

[9]     Because the standard for "deficient performance" is an objective one, a reviewing court is not confined to evidence of counsel's subjective state of mind, "[a]lthough courts may not indulge [in] 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *See Richter*, 562 U.S. at 109.

*Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995), *cert. denied*, 516 U.S. 1124 (1996) (disposing of an ineffective assistance of counsel claim without reaching the issue of deficient performance because petitioner failed to make the requisite showing of prejudice).

### 2. Analysis

This Court concurs with the Court of Appeal's determination that Petitioner has failed to make the requisite showing of *Strickland* prejudice. First, the Court of Appeal determined that the jury "was properly instructed [under state law] on the presumption of innocence, the People's burden of proof, and the concept of reasonable doubt." (*See* ECF No. 9-12 at 4.)[10] Accordingly, if the jury believed Pathammavong or another individual committed the shooting, presumably it would have acquitted Petitioner. (*See id.*) As the Supreme Court stated in *Strickland*, "[i]n making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to the law." *See Strickland*, 466 U.S. at 695.

Second, it appears from the trial record that the jury heard evidence regarding Pathammavong's alleged role in the incident. During trial, Syrattanakoun testified as a witness for the prosecution. (*See* ECF No. 9-25 at 148 to 9-26 at 90.) He testified that he informed police during a 2004 interview that Pathammavong had told him that he committed the shooting. (ECF No. 9-26 at 40-41, 51-56.) Syrattanakoun further testified that he also told police during the 2004 interview that he had seen Pathammavong and Sulit drive into the alley where the shooting occurred. (*Id*. at 38, 59.)[11]

---

[10] This conclusion is binding on the Court. *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 71-72.

[11] Syrattanakoun later recanted both statements, stating that he lied to law enforcement. (ECF No. 9-26 at 38-59.)

After Syrattanakoun took the stand, Pathammavong testified for the prosecution. (*See* ECF No. 9-26 at 136 to ECF No. 9-27 at 76.) Pathammavong testified that he told his friends that he committed the shooting. (*Id.* at 184.)[12] His former girlfriend corroborated this testimony, testifying that Pathammavong told her that he did the shooting, shortly after it occurred. (ECF No. 9-28 at 123.) Pathammavong further testified that he was originally charged with taking part in the shooting, but entered an agreement with the government, whereby he would plead guilty only to the crime of being an accessory after the fact, in exchange for his truthful testimony. (ECF No. 9-26 at 137-39.)

Later, Soulivong took the stand, and testified that he originally told law enforcement that Pathammavong and Sulit committed the shooting. (ECF No. 9-29 at 281.)[13] Finally, in closing arguments, defense counsel argued that Pathammavong had not only implicated himself, but had been implicated by others, and that he was more involved than as an accomplice. (*See* ECF No. 9-34 at 31-37, 102-05.)

Given the foregoing, this Court finds that it was not objectively unreasonable for the Court of Appeal to conclude that "the record clearly shows that the jury knew the defense believed individuals other than Le and Yang (e.g., Pathammavong) committed the drive-by shooting." (*See* ECF No. 9-12 at 4.)

In his Petition, Petitioner also contends that he was prejudiced by his counsel's failure to request a third-party culpability instruction because CALCRIM Nos. 334 and 373 led the jurors to find Pathammavong culpable solely in addition to, or as an accomplice of, the defendants, and not culpable as the perpetrator, and that a third-party instruction would have cured this deficiency. (Pet. at 9.) CALCRIM Nos. 334 and 373 state:

---

[12] Pathammavong later testified that he was lying when he admitted to the shooting. He testified that he was young, had a lot of alcohol in him, and he started running his mouth and trying to be cool. (ECF No. 9-26 at 184-85.)

[13] Soulivong also later recanted and testified that he lied to law enforcement. (ECF No. 9-29 at 281.)

## 334. ACCOMPLICE TESTIMONY MUST BE CORROBORATED: DISPUTE WHETHER WITNESS IS ACCOMPLICE

Before you may consider the statement or testimony of Bo Pathammavong as evidence against either defendant regarding the crimes charged in this case, you must decide whether he was an accomplice to those crimes. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if he or she personally committed the crime or if:

1.     He or she knew of the criminal purpose of the person who committed the crime;

AND

2.     He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime.

The burden is on the defendant to prove that it is more likely than not that Bo Pathammavong was an accomplice.

An accomplice does not need to be present when the crime is committed. On the other hand, a person is not an accomplice just because he or she is present at the scene of a crime, even if he or she knows that a crime will be committed or is being committed and does nothing to stop it.

A person may be an accomplice even if he or she is not actually prosecuted for the crime.

If you decide that Bo Pathammavong was not an accomplice, then supporting evidence is not required and you should evaluate his or her statement or testimony as you would that of any other witness.

If you decide that Bo Pathammavong was an accomplice, then you may not convict either defendant of the crimes charged based on his statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendants only if:

1.     The accomplice's statement or testimony is supported by other evidence that you believe;

2.     That supporting evidence is independent of the accomplice's statement or testimony;

AND

3.     That supporting evidence tends to connect the defendant to the commission of the crimes.

Supporting evidence, however, may be slight. It does not need to be

enough, by itself, to prove that the defendant is guilty of the charged crime[s], and it does not need to support every fact (mentioned by the accomplice in the statement/ [or] about which the accomplice testified). On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime.

Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence.

(ECF No. 9-41 at 45-46.)

### 373. OTHER PERPETRATOR

The evidence shows that another person may have been involved in the commission of the crimes charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether that other person has been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crimes charged.

This instruction does not apply to the testimony of Kane Bo Pathammavong.

(ECF No. 9-41 at 55.)

Petitioner made the same argument on direct appeal and the Court of Appeal rejected it. (*See* ECF No. 9-12 at 2-4, n.13.) The Court of Appeal noted that CALCRIM No. 334 simply "states the rule provided in Penal Code section 1111 that a defendant cannot be convicted by the testimony of an accomplice unless it is corroborated by other evidence. This rule exists because the testimony of an accomplice is viewed with a certain amount of caution." (*Id*. at 3, n.13.) In addition, the Court of Appeal noted that CALCRIM No. 373 simply "focuses on the significance of the facts that (1) the third party may not be currently participating in the criminal prosecution of the defendant, and/or (2) may not have been, or might not be, criminally prosecuted." (*Id*. at 2.) The instruction "does not tell the jury it cannot consider evidence that someone else *committed* the crime, but rather it merely says the jury is not to speculate on whether someone else might or might not be *prosecuted*."

(*Id.* (internal quotation marks omitted).)  As such, the Court of Appeal found that these instructions related to issues irrelevant to third-party culpability.  (*Id.*)

This Court concurs with the Court of Appeal's reasoning.  First, as the Court of Appeal explained, CALCRIM Nos. 334 and 373 do not relate to third-party culpability.  Second, at no time was the jury instructed that it could not consider Pathammavong to be a perpetrator of the crime.  In his closing, the prosecutor, in discussing CALCRIM No. 334, even informed the jury that it had to determine whether Pathammavong was an accomplice.  (*See* ECF No. 9-33 at 263-64.)  Thus, his role in the offense was not clearly defined, despite the plea agreement.  In addition, defense counsel argued in closing that Pathammavong was more involved than as an accomplice, relying on the testimony presented at trial.  (*See* ECF No. 9-34 at 31-37, 102-05.)  As such, this Court finds that it was not objectively unreasonable for the Court of Appeal to find there was no prejudice when defense counsel decided not to ask for a third-party culpability instruction.

The Court therefore finds that the Court of Appeal's rejection of Petitioner's ineffective assistance of counsel claim on the basis of his failure to make the requisite showing of *Strickland* prejudice neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

## RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the District Judge issue an Order (1) approving and adopting this Report and Recommendation; and (2) directing that judgment be entered denying the Petition and dismissing this action with prejudice.

Any party having objections to the Court's proposed findings and recommendations shall serve and file specific written objections within **fourteen (14) days** after being served with a copy of this Report and Recommendation.  *See* Fed. R. Civ. P. 72(b)(2).  The objections should be captioned "Objections to Report and Recommendation."  A party may respond to the other party's objections within **fourteen (14) days** after being served with a copy of the objections.  *See id.*  The failure to object within the time limit specified shall

be deemed a consent to any proposed findings of fact.

The parties are advised that Rule 11 provides that in habeas corpus matters pursuant to 28 U.S.C. § 2254, the District Judge must issue or deny a Certificate of Appealability when a final order adverse to the applicant is entered. The parties may wish to take this Rule into consideration at the time they file any Objections to the Report and Recommendation.

The Report and Recommendation of a Magistrate Judge is not a final appealable order. Any Notice of Appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of a judgment and/or order by the District Judge.

IT IS SO ORDERED.

Dated: May 21, 2018

_____
HON. ROBERT N. BLOCK
United States Magistrate Judge